State, ex rel., v. Taylor.

STATE, *ex rel.* BATE BOND, State Revenue Agent, *v.* THOMAS J. TAYLOR, County Trustee.

(*Jackson.* Special September Term, 1907.)

1. **TAXATION.** County trustee possesses jurisdiction to reassess or back assess property for taxation, when.

A bill alleging that a street railway company's property was glaringly and inadequately assessed for taxation at much less than its cash value for certain specified years; that the company's schedule returns were fraudulently incorrect, etc.; and that this, in conjunction with the negligence of the assessors, resulted in relieving a large part of such property from taxation, states a case for the exercise of the county trustee's jurisdiction in a proceeding before him for the reassessment or back assessment of defendant's property for taxation. (*Post, pp.* 233-246.)

Acts cited and construed: Acts 1903, ch. 285, sec. 31, subsecs. 2, 3, and 5.

2. **SAME.** Mandamus will lie to compel county trustee to take jurisdiction of proceeding for reassessment or back assessment of property for taxation, when.

Where a county trustee possesses jurisdiction of a proceeding for the reassessment or back assessment of property for taxation instituted by a State revenue agent, and declines to take jurisdiction and erroneously refuses to hear such proceeding because of the alleged want of jurisdiction, a writ of *mandamus* will lie as the proper remedy to compel such county trustee to take jurisdiction of the proceeding and to hear the same, and render some judgment on the merits. (*Post, pp.* 245-252.)

Acts cited and construed: Acts 1903, ch. 258, sec. 38.

Cases cited and approved: State, ex rel., v. Hunter, 3 Wash., 92, and citations; Richardson v. Farrar, 88 Va., 760, 766-770; State, ex rel., v. Judge, 34 La. Ann., 1177; State, ex rel., v. Ellis, 41 La. Ann., 41.

3. **SAME.** Railroad commissioners are ex officio State tax assessors.

The board of railroad commissioners created by Acts 1897, ch. 10, became also a board of State tax assessors *ex officio* under a prior statute (Acts 1897, ch. 5, sec. 1) providing for a board of State tax assessors to be appointed by the governor, in case an act should not be passed at the same session of the legislature creating a board of railroad commissioners, and, in case such act should be passed, then that the duties prescribed in said act contained in said chapter 5 should be devolved upon such railroad commissioners. (*Post, pp.* 252, 253.)

Acts cited and construed: Acts 1897, ch. 5, sec. 1; ch. 10.

4. **STATUTES.** Act not purporting to amend a former law need not recite its title or substance.

The statute contained in Acts 1905, ch. 513, providing for the just and equitable assessment of interurban railroad and street railroad property for State and municipal taxation, and for the collection of taxes assessed and imposed thereon, etc., is an independent act complete itself, and not purporting to be amendatory of Acts, 1897, ch. 5. If the act is amendatory at all, it is only an implied amendment, and its failure to recite the title or substance of the said act of 1897 does not invalidate it. (*Post, pp.* 253, 254.)

Acts cited and construed: Acts 1897, ch. 5; Acts 1905, ch. 513.

Constitution cited and construed: Art. 2, sec. 17.

Cases cited and approved: Poe v. State, 85 Tenn., 495; Railroad v. Crider, 91 Tenn., 506, 507; State v. Yardley, 95 Tenn., 558.

5. **SAME.** Act for taxation of interurban and street railroads extending beyond the city limits is not unconstitutional as class legislation, when.

Acts 1905, ch. 513, providing for the just and equitable assessment of interurban railroad and street railroad property in a particular manner for State and municipal taxation, and for the collection of taxes assessed and imposed thereon, applies

State, ex rel., v. Taylor.

only to interurban railroad lines and street railroad lines extending beyond the boundaries of a single city, whether they run to any other city or not; and so construed is not unconstitutional as an improper classification of property for taxation.    (*Post, pp.* 254-256.)

Acts cited and construed:    Acts 1897, ch. 5, sec. 7; Acts 1903, 258, secs. 22, 24; Acts 1905, ch. 513.

Constitution cited and construed: _ Art. 11, sec. 8.

Cases cited and approved:    Franklin Co. v. Railroad, 12 Lea, 521, 534, 542.

6.  **SAME.**   Subject in body covered by the title; case in judgment.
    Acts 1905, ch. 513, entitled "An act to provide for the just and equitable assessment of interurban railroad and street railroad property for State and municipal taxation, and for the collection of taxes assessed and imposed thereon," and in section 3 declaring that every person or corporation operating interurban and street railroad properties, including electric light and power properties, when owned and operated in conjunction with street railroad properties, shall file a specified schedule for taxation of the same under such act, does not introduce and embrace in its body a new subject not covered by the title, because the provision of said section applies to interurban railroad · or street railroads owning and operating electric plants for the sale of surplus electricity generated for the operation of the railroad and not to separate electric light plants owned by railroads.    (*Post, pp.* 242, 256-263.)

    Acts cited and construed:    Acts 1903, ch. 258, secs. 22, 24; Acts 1903, ch. 406, sec. 1; Acts 1905, ch. 513, sec. 3.

    Constitution cited and construed:    Art. 2, sec. 17; art. 11, sec. 8.

7.  **SAME.**   A separable subject in the body not embraced in the title may be eliminated without impairing the rest of the act, when.
    A provision in the body of the act not embraced in its title will not invalidate the residue thereof, where such provision is ⁻

merely incidental and may be eliminated without impairing the integrity of the act. (*Post, pp.* 256, 257, 260.)

Acts cited and construed: Acts 1905, ch. 513, secs. 3, 18.

Constitution cited and construed: Art. 2, sec. 17.

Cases cited and approved: State v. Wilson, 12 Lea, 246, 254; State, ex rel., v. Trewhitt, 113 Tenn., 561.

8. **SAME.** Provisionas to street railroads construed to apply to interurban railroads also, when.

While section 18 of Acts 1905, ch. 513, speaks of street railroads only, yet it is clear that construing the whole act together it was intended by the legislature in this section to cover, not only street railroads, but interurban railroads as well. (*Post, p.* 257.)

9. **MANDAMUS.** Peremptory writ will issue upon the overruling of a demurrer, when there is no valid defense.

Where, in a *mandamus* proceeding to compel a county trustee to hear and determine an application for the back assessment and reassessment of street railway property, the defendant's demurrer was overruled on appeal, and it appeared that no valid defense could be made, a peremptory writ of mandamus will be awarded without leave to answer. (*Post, pp.* 258, 259, 264, 276, 277.)

10. **TAXATION.** Action of board of equalization is not final as against reassessment before county trustee, when.

Under the assessment laws of 1901 and 1903, neither the action of the county board of equalizers nor that of the State board of equalization was final or conclusive, in the sense that it prevented a further back assessment or reassessment, for taxation, of property inadequately assessed or entirely omitted from assessment. (*Post, pp.* 266-277.)

Acts cited and construed: Acts 1901, ch. 174, secs. 33, 38; Acts 1903, ch. 258, secs. 13-19, 21-26, 31, 33, 38, subsecs. 4, 10 11; Acts 1905, ch. 513.

State, ex rel., v. Taylor.

FROM SHELBY.

Appeal from the Chancery Court of Shelby County.—
F. H. HEISKELL, Chancellor.

ATTORNEY-GENERAL CATES and CARROLL & McKEL-
LAR, for complainant.

JAMES C. BRADFORD and E. E. WRIGHT, for defend-
ant.

MR. JUSTICE NEIL delivered the opinion of the Court.

The bill in this case was filed in the chancery court
of Shelby county to obtain a *mandamus* against the
county trustee of Shelby county, in respect of an ap-
plication made by relator before the latter, concerning
a reassessment, or back assessment, of the property of
the Memphis Street Railway Company. The chancellor
awarded an alternative writ, which was served upon
the defendant. The latter, instead of making a return
to the writ directly, demurred to the bill, and this was
treated in the court below as properly raising the ques-
tions presented in the case, and will be accordingly so
treated here, without passing upon the propriety of the
practice adopted. The chancellor sustained the de-

murrer and dismissed the bill, and from this decree the complainant has appealed to this court, and has here assigned errors.

Before stating the substance of the bill and demurrer, we shall set out the sections of the statute that control the controversy, viz.:  Section 31 and section 38, subsec. 11, chapter 258, pp. 660, 674, of the Acts of 1903:

"Sec. 31.  That any property or properties included in this act shall be back, or re-assessed for the period now provided by law, viz.:

"(1)  When the same have been omitted from or escaped taxation.

"(2)  When the same has been willfully or knowingly, or by the negligence of the tax assessor, or board of equalizers, assessed or computed at a value less than its actual cash value.

"(3)  When the same has been assessed by the assessor or computed by the board of equalizers at less than its actual cash value by reason of any fraud, deception, misrepresentation, or misstatement of the owner of the property or his agent or attorney.

"(4)  When the owner of the property connives at or fraudulently procures, or induces an assessment to be made by the assessor, or computed by the board of equalizers at less than its actual cash value.

"(5)  When the owner, or his agent, fails, refuses, or neglects to list the property to the assessor, as required by law.

"(6)   Whenever it is within his knowledge or he has reason to suspect in his county that any property has, in violation of this act as above prescribed, been assessed by any assessor, or computed by any board of equalizers at less than its actual cash value, it shall become the duty of any revenue agent, or any district attorney, or any attorney of the county, of the judge or chairman of the county court, of the county court clerk, of any circuit, chancery, and criminal court clerk, of any sheriff, and of any citizen of the county, to cause or have the county court clerk, in the case of merchants' taxes, and the county trustee, in case of other taxes covered by this act, to have issued the citation hereinafter set out, for the purpose of back or reassessing such property.   At the request of or upon the information or motion of any citizen or taxpayer of the State, or of any of the officers above named, it shall be the duty of the county court clerk, in the case of merchants' taxes, and the county trustee, in the case of other taxes covered by this act, to issue, for the purpose of back or re-assessing property, the citation hereafter set out.   The county court clerk, in the case of merchants' taxes, and the county trustee, in the case of other taxes covered by this act, upon the motion or information, or at the request of any citizen or taxpayer of the State, or of any of the officials before designated, or when the same is within the knowledge of, or suspected by the county court clerk, or county trustee, shall issue as to any property assessed or valued in

violation of this act, at less than the actual cash value of the same, a citation to be served by any officer of the county or of any district thereof, upon the owner of the property, or his agent, or representative, or attorney, summoning him to appear before such clerk or county trustee, at his office giving not less than five days' notice from the date of the issuance of the citation and show cause, if any, why said property should not be back or re-assessed at its actual cash value. The form of citation shall be substantially as follows, viz.:

"State of Tennessee, ———— County.

"To ————, at ————, Tenn.:

"Proper motion having been made before me by ————, State revenue agent for the State of Tennessee under section ————, chapter ————, of the Acts of Tennessee, 190—, you are hereby cited to appear before me, ————, trustee or county court clerk for ———— county, Tennessee, on the ———— day of ————, 190—, at ———— o'clock ———— M., for the purpose of being assessed or re-assessed for the years ———— upon omitted or inadequately assessed property in the said county and State, and show cause if any, why said property should not be back or re-assessed at its actual cash value.

"————————————

"Trustee or county court clerk,

"———— county, Tenn.

"Issued at office this ———— day of ————, 190—.

"The officials herein named as having power to back or re-assess property, are vested with full authority to administer oaths, send for and examine witnesses, and take such steps as may be deemed necessary or material to obtain information and evidence as to the value of the property. Said witnesses, when properly summoned, shall be amenable to existing laws for non-attendance or failure to give evidence which is in their knowledge.

"Said officials herein vested with the power to back or re-assess property shall have full authority, in proceedings, to back or re-assess such property, to make proper, correct, and adequate assessments of the same at its actual cash value, which, when entered upon the tax books or filed in writing with the authorized tax-collecting authority, shall become a final and valid assessment of the property, and collectible as such, as fully and amply as if originally entered upon the assessment rolls. Should it appear that any property has been assessed at less than its actual cash value, in violation or in disregard of the provisions of this act, the official back or re-assessing the same, shall add to the assessment a penalty of fifteen per centum upon the amount of the added tax, and the cost of the proceeding, which said penalty and cost shall become a part of the taxes and collectible as such. If the proceeding is determined in favor of the owner of the property, the cost shall be paid by the county.

"It shall be the duty of the clerks of the county courts

to examine and compare the assessment rolls of the county with the inventories or reports of administrators and executors as soon as filed with the county court clerk, for the purpose of ascertaining whether any personal property of any estate is subject under this act to back or re-assessment. In case such examination shall show any personalty subject to such back or re-assessment, the clerk of the county court shall report the same to the county trustee, who shall back or re-assess the same, under the provisions of this act, and add thereto the penalty heretofore designated.

"In case the county court clerk or county trustee shall fail or refuse to perform the duty herein imposed, such clerk or trustee shall become liable, on his official bond for the amount of taxes which might have been recovered had said duty been properly performed, together with a penalty of fifteen per cent. added thereto, said liability and penalty to be recovered in any court of record or before any justice of the peace at the instance of any district attorney or revenue agent of the State, or by suit, or by motion or five days' notice in the chancery or circuit courts, or before any justice of the county."

"Sec. 38. That the secretary of state, treasurer, and comptroller of the treasury of the State, and their successors in office, are hereby created a State board of equalization and invested with the powers and required to perform the duties hereinafter prescribed, viz.: . . .

State, ex rel., v. Taylor.

"(11)   Said board of equalization shall also hear appeals upon matters of back or re-assessments made by revenue agents or other officers of the State from county trustees or county court clerks.   The right of appeal from the decision of said trustees or county court clerks in the matter of back or re-assessments is hereby given to the State and county or party assessed or re-assessed; provided, said appeal is prosecuted within ten days from the date of such back or re-assessment or attempt to back or re-assess, and the said trustee or county court clerk shall, upon such appeal being perfected, certify his action to the State board of equalization, whose duty it shall be to hear the matter in controversy within ten days from the filing with them, or either of them, the notice of appeal, provided, said board is then in session."

The bill alleges:   That it came to the knowledge of relator "that, in violation of the provisions of the law, the property of the Memphis Street Railway Company was assessed at less than its actual cash value, and glaringly and inadequately assessed for taxation." That for "the years 1902, 1903, 1904, 1905, the Memphis Street Railway Company did not comply with the provisions of law in regard to returning its property for taxation."   "That on the 25th day of May, 1904, the Memphis Street Railway Company, by its vice-president, filed a schedule purporting to comply with the law, and therein set forth and stated, among other things, that the bonded debt of the company was $906,-

000 of the market value of about par. The quoted value on the above date was 113. That the stock of the corporation authorized was $500,000, all of which was issued, and that it had no market value except for control. A copy is annexed hereto as a part of this petition. The relator has not been able to obtain the tax schedules for the years 1903 and 1902, but he avers to the court that the one last above referred to is misleading and erroneous in several particulars, but, upon the schedule so returned, misled thereby, the assessor, through negligence, fixed the actual cash value of the property of the Memphis Street Railway Company at $1,700,000, when, in truth, as relator is informed, believes, and from information avers, its actual cash value was then $7,500,000." "That during the years 1902, 1903, 1904, instead of there being a little upwards of $900,000 of bonds outstanding, there were upwards of $4,000,000, if not $5,000,000, outstanding, with fixed charges thereon amounting to over $250,000 annually. The relator avers that under the seventh subsection of the law requiring a schedule there is provided that an itemized statement of all stocks and bonds, securities, notes, accounts, and choses in action owned or held, whether the same be unincumbered or transferred or deposited, or used as collateral, wherever the same may be situated, and also all money on hand or on deposit, wherever the same may be situated, shall be set forth, and that, notwithstanding this statutory requirement, the relator avers that at no time did the street railway

company comply therewith, and notwithstanding the fact that it had properties enumerated and called for in the aforesaid section. The relator further shows to the court that under the assessment laws of the State, the latest of which is to be found in the Acts of 1903, the Memphis Street Railway Company was subject to be assessed for taxation upon its properties, but there is no controversy that can arise but that under the assessment law of 1903, and the previous law of 1901, which is, in all respects material, similar to the one of 1903, it is subject to be assessed for taxation, and to be re-assessed or back assessed.

"The relator further avers that for the years 1902, 1903, 1904, 1905, the property of the Memphis Street Railway Company was grossly undervalued; that said undervaluation was due to the negligence of the officers charged with the duty of assessing the same, and to the failure of the owner of the said property to comply with the statute; and thereby the said owner escaped its share of the public burden."

In respect of the taxes for the year 1905, the following special additional allegations were made:

"The relator is advised that it (the property of the street railway company) is also subject to be back assessed for taxation for the year 1905, under the assessment law of 1903, because he avers by advice of counsel that the special act passed on the 15th of April, 1905, being chapter 513, p. 1152, of the session acts of that

year, is violative of the provisions of the organic law, and particularly violative of that provision of the constitution, which ordains that no bill shall become a law which embraces more than one subject, that to be expressed in the title.

"Aforesaid chapter is an act to provide for the just and equitable assessment of interurban railroad and street railroad property for State and municipal taxation, and for the collection of taxes assessed and imposed thereon, but, by the third section thereof, there is included electric light and power properties, when owned and operated in conjunction with street railway property, which is a foreign subject, altogether to the title, and so interwoven with the other provisions of the act as to render the whole void.

"And the relator is further advised that the said act is inoperative and void, because it is class legislation, in that it fails to fix ·as the assessable value of the property of interurban and street railroad companies the actual cash value of the same, thereby improperly classifying such property for taxation upon a different basis of value from that arbitrarily fixed and required upon all the other properties of the State subject to taxation.

"The relator further shows that he is informed, believes, and from information avers the fact to be that in the early part of 1905 the shareholders in the Memphis Street Railway Company sold the entire stock in that company to Mr. Newman and his associates at and for

a sum approximating $7,500,000, excepting from said sale certain real estate which was of the value of $200,000 or $300,000; that the Memphis Street Railway Company was organized about the year 1895, and it acquired all the physical property, franchises, and shares of stock in the Citizens' Street Railway Company, the Raleigh Springs Railway, the East End Railway, the Prospect Park and Dummy Line, which said shares of stock are embraced and enumerated in a mortgage which it. executed to secure the payment of $5,-000,000 of bonds bearing five per cent interest; that after the purchase of the said property by Mr. Newman and his associate, and to wit, on the 23d of August, 1905, under the aforesaid unconstitutional act, the railroad commission assessed the property for taxation at $3,212,131.64, or upwards of $4,000,000, less than the relator was informed, believes, and avers Mr. Newman and his associates paid for the said property.

"The relator further shows to the court that very shortly after the purchase of the said property the capital stock of the corporation was increased from $500,000 to $5,000,000 being $2,000,000 of preferred stock, and $2,500,000 of common stock, and that on the 21st of June of that year the preferred stock sold in the market at $90 per share, and the common stock for $60 or $70 per share, the shares being $100 each."

Upon the subject of the relator's efforts to obtain from the county trustee a reassessment or back assess-

ment of the property, the bill contains the following allegations:

That, when the above facts came to the relator's knowledge, he "requested the defendant to issue a citation provided for by law to the defendant company, summoning it to appear before him to show cause if any why its property should not be back or reassessed at its actual cash value. The aforesaid citation was duly issued and served, and the defendant street railway company duly appeared before the said defendant, who at its request, from time to time, postponed the hearing, until Monday, the 16th day of July last, when, after hearing argument on the question, the defendant affirmed that he could not take jurisdiction of the matter, and declined to further proceed in accordance with the citation. In short, the defendant, being of opinion that he was without jurisdiction of the matter, refused to take it. . . . The relator is advised that he is entitled to have the defendant perform the clear ministerial duty pointed out by the statute, namely, proceed to hear the complaint of the State of Tennessee, and to back assess, or reassess, the properties of the Memphis Street Railway Company, to make proper, correct, and adequate assessment of the same at its actual cash value, and he is advised that the State of Tennessee has no other adequate remedy than through the mandate of this court." It is further alleged that the relator "sought, as it was his duty to seek, to set in motion the proceedings necessary, as provided by

State, ex rel., v. Taylor.

the State of Tennessee, in the exercise of its sovereignty, to avail itself of the remedy provided for the illegal deficiency, and, although the statute plainly provided for the performance of a duty by the defendant to reassess the aforesaid property, he declined to assume jurisdiction so to do, leaving the State of Tennessee without any adequate remedy for the collection of the just burden of government upon the properties of the said Memphis Street Railway Company."

The demurrer filed to the bill has numerous subdivisions, but may be stated adequately in two parts. The first part attacks the whole bill in so far as the latter undertakes to state a basis for any relief whatever against the defendant. The substance of this part of the demurrer is that the allegations of the bill, when rightly construed, mean, that the county trustee considered the matters brought to his attention by the citation, and adjudicated them against the complainant; that upon such a state of facts the remedy of the State was an appeal to the State board of equalization, *and that, therefore, the chancery court had no jurisdiction to award the writ of mandamus;* that an application for the latter relief cannot be successfully made when the party has any other adequate relief; that, if the party, at one time, had the right to such relief— that is by appeal to the State board of equalization— and lost it because of failure to apply in time, such party could not thereafter be properly granted a *mandamus;* that the decision of the county trustee was a

judgment, and the chancery court had no jurisdiction to review that judgment by or through the writ of mandamus, or in any other way, or to compel the county trustee to change his judgment in any manner whatever; that such change could be effected only by an appeal taken and prosecuted in due time to the aforesaid State board.

The second part of the demurrer presents the point that the act of 1905 referred to in the bill is constitutional, and the assessment for that year was properly made thereunder.

Before directly taking up for consideration the points in the demurrer, we deem it proper to say that we think the facts stated in the bill, which we have set out, make out a case for the jurisdiction of the county trustee to reassess, or back assess, the property of the Memphis Street Railway Company, within subdivisions 2, 3, and 5, of section 31, above set out, of chapter 258, p. 660, 661, of the Acts of 1903.

It is perfectly true, as insisted by counsel for the defendant in support of the first part of the demurrer, that mandamus will not lie while there is any other adequate remedy. It is likewise true that by this writ the court can only compel a judicial officer to take action on a matter within his jurisdiction, and cannot direct what judgment he shall render, but simply that he shall discharge his functions and render a judgment in some form in respect of the matter before him.

We are of the opinion that defendant's counsel er-

roneously construed the allegations of the bill in respect of the nonaction of the county trustee. The substance of those allegations is that he issued the citation required by law; that it was served upon the defendant therein named, the Memphis Street Railway Company; that the latter came before the aforesaid officer, likewise the relator in behalf of the State; that the question of jurisdiction was argued; that the aforesaid county trustee, after hearing this matter argued, decided that he had no jurisdiction of the controversy, and refused to proceed further—that is, that he refused to hear the case on its merits.

Considering these allegations to be true, as the demurrer necessarily does, a clear case for granting the writ of *mandamus* was made. It is erroneously argued by the defendant's counsel that an appeal from this action of the county trustee lay to the State board of equalization under subsection 11 of section 38 of chapter 258 of the Acts of 1903. Under that subsection, the appeal lies only from the decision of the county trustee, or county court clerk, as the case may be, on the merits. The county trustee and the State board of equalization have *quasi* judicial powers, but these are carefully limited by the statute. It is not for either of these bodies to refuse to take jurisdiction of the matter clearly placed within their powers by the statutes of the State. It is for the regular courts of the State to decide what that jurisdiction is when any question arises thereon, and to compel them to take jurisdiction,

by the writ of *mandamus,* when they improperly refuse to take such jurisdiction, and to restrain them by *certiorari* and *supersedeas* when they erroneously assume jurisdiction.

Moreover, the great weight of authority supports the proposition that *"mandamus* lies to compel an inferior court to hear and determine a cause or matter properly triable before it, which the lower court fails or refuses to try on the ground that it has no jurisdiction, or that the judge is incompetent, or for other reasons." 19 Am. & Eng. Enc. of L. (2 Ed.), 827, and authorities cited.

We shall now refer to a few of the authorities.

In *State, ex rel. Shannon,* v. *Hunter,* 3 Wash., 92, 27 Pac., 1076, it appeared that the return of the respondent to the alternative writ of *mandamus* showed that he had dismissed the suit in question for want of jurisdiction to hear it, because the amount sued for was less than $100. The questions to be decided, and that were decided, arose upon this return. These questions were whether the court which refused jurisdiction had, in fact, jurisdiction where the sum sued for was less than $100, and whether *mandamus* was the proper remedy where the cause was wrongfully dismissed, because in the opinion of the court it had no jurisdiction therein.

After deciding the first question in the affirmative, the supreme court of Washington continued:

"The superior court then erroneously dismissed the case, and the remaining question above suggested is

as to the proper remedy.  The position taken by the respondent is that such judgment of dismissal is the final judgment, and determines the cause as fully as would a judgment on the merits; that in rendering the same the court acts judicially and its discretion in so doing cannot be controlled by *mandamus*.  There is much force in this position; and, if the question were a new one, unaffected by authority, we might come to the conclusion that the proper remedy in such a case was by appeal, not by *mandamus,* but the authorities seem to have established the other doctrine, and to have decided that from judgments of dismissal for want of jurisdiction no appeal will lie, but that the only remedy is by *mandamus*.  This doctrine was established in the supreme court of the United States many years ago.  In *Ex parte Bradstreet,* 7 Pet., 634, 8 L. Ed., 810, the supreme court of the United States issued a *mandamus* to a United States district judge to reinstate a cause which he had dismissed for want of jurisdiction, and to proceed in the trial of the same.  In *Ex parte Parker,* 120 U. S., 737, 7 Sup. Ct., 767, 30 L. Ed., 818, the same court by writ of *mandamus* directed the supreme court of this territory to reinstate a cause which it had dismissed, because, in its judgment, it had no jurisdiction, and to proceed to hear the same upon its merits.  The same doctrine was announced in 131 U. S., 221, 9 Sup. Ct., 708, 33 L. Ed., 123, where, in the same manner, the court commanded the supreme court of said territory to reinstate and hear a case, although the

judges who had rendered the judgment of dismissal had gone out of office, and an entirely new set of judges had been installed. In *Harrington* v. *Holler,* 111 U. S., 796, 4 Sup. Ct., 697, 28 L. Ed., 602, the same court held directly that no appeal would lie upon a judgment of dismissal for want of jurisdiction rendered in the supreme court of this territory, and that the remedy, if any, was by *mandamus.* It will be seen from the above that the supreme court of the United States has from an early date uniformly held to a different doctrine from that contended for by respondents. If we look at the decision of the courts of last resort in the States, we shall find them to be almost uniformly upon the same side of the question. We shall not attempt to review these latter cases, but the case of *State, ex rel. Keane,* v. *Murphy,* 19 Nev., 89, 6 Pac., 840, is the most interesting one upon this question. The learned judge of that court, in deciding said case, not only sustained the doctrine as above stated, but entered into a discussion of the reasons therefor with such success that there seems little chance of escape therefrom. He says that the discretion of the lower court is not controlled by such a writ; that the question as to whether or not such court has jurisdiction in the particular matter is a preliminary one; that the appellate court in granting the writ decides that question for the lower court, and does not compel it to decide it at all, and at great length elaborates and ably maintains the position contended for by the petitioner in this proceeding. In view

of these authorities, we feel bound to hold that the proper remedy, where a cause has been erroneously dismissed for want of jurisdiction, is *mandamus.*"

To the same effect, see *Richardson* v. *Farrar,* 88 Va., 760, 766-770, 15 S. E., 111; *State, ex rel. Chism & Boyd,* v. *Judge,* 34 La. Ann., 1177; *State, ex rel. Daniel Cohen,* v. *T. C. W. Ellis, Judge,* 41 La. Ann., 41, 6 South, 55.

In *State, ex rel. Daniel Cohen,* v. *T. C. W. Ellis, Judge,* it is said: "Relatively to the question of our jurisdiction to allow the relief now sought, it suffices to say that it is a settled rule, expounded by this court, that a distinction is recognized between cases in which it is sought by *mandamus* to control the decision of the inferior court on the merits of the cause and cases in which it has refused to go into the merits of the action, upon some erroneous construction of some question of law or practice, preliminary to the whole case."

In High on Ex. Rem., section 151, it is said: " 'A distinction is recognized between cases where it is sought by *mandamus* to control the decision of the inferior court, on the merits of the cause, and cases where it has refused to go into the merits of the action, upon an erroneous construction of some question of law or practice preliminary to the whole case."

Our cases upon the subject of *mandamus* are very numerous, but we have examined all of them, and find in none of them anything adverse to the rules laid down in the foregoing authorities.

We should add, however, perhaps, by way of quali-
fication, that probably where the point arises in one
of the regular courts of the State on plea in abatement
or motion raising a question of jurisdiction of the per-
son or subject-matter, and there is a consequent dis-
missal of the case, with a judgment for costs, and
wherein, under the course of our practice, an appeal
lies, to test the correctness of the action of the lower
court, *mandamus* would not be applicable, so, in other
cases, in the regular courts of the State, where there is
a dismissal of the action for want of jurisdiction, fol-
lowed by a judgment for costs. But in the classes of
cases just referred to there is a distinct judgment en-
tered upon which an appeal may be prayed and prose-
cuted.

For the reasons stated, we are of the opinion that
the grounds of demurrer, covering the whole bill, were
not well taken, and should have been overruled by the
chancellor.

We shall now consider the second division of the de-
murrer, which raises the question of the constitution-
ality of chapter 513, p. 1152, Acts 1905.

It is first objected by the State that there are no such
officers as the State tax assessors referred to in the
first section of that act.

This is a mistaken view. The first section of chapter
5, p. 102, Acts 1897, referred to in the first section of
the above-mentioned act of 1905, provides for a board
of State tax assessors to be appointed by the governor,

in case at the same session of the legislature an act should not be passed creating a board of railroad commissioners, and, in case such act should be passed, then that the duties prescribed in chapter 5 should be devolved upon such railroad commissioners. In chapter 10, p. 113, Acts 1897, the board of railroad commissioners was created. Thereupon the members of that commission likewise obtained the title of State tax assessors, and the duties prescribed in chapter 5 of the acts of 1897 were devolved upon them *ex officio.*

It is insisted that the act of 1905 is but an amendment of the act of 1897, and, inasmuch as it does not recite the title or substance of the former act in its title or in its body, that it is unconstitutional, as in violation of the last clause of article 2 of section 17 of the State constitution. We think this is a mistaken view. The act does not purport to be, and is not, an amendatory act. It is an independent act, complete in itself. The officers referred to are simply given other duties, just as additional duties may be imposed by statute upon the sheriff, or coroner, or any other officer of the State created by the constitution or established by law. It could be considered at most, if an amendment at all, only as an implied amendment, and amendments of this character are not covered by the constitutional provision referred to. *Poe* v. *State,* 85 Tenn., 495, 3 S. W., 658; *Railroad* v. *Crider,* 91 Tenn., 506, 507, 19 S. W., 618; *State* v. *Yardley,* 95 Tenn., 558,

32 S. W., 481, 34 L. R. A., 656; 1 Lewis' Sutherland, Statutory Construction, sec. 239. In the authority last cited it is said:

"Where an act does not purport to be amendatory, but is enacted as original and independent legislation, and is complete in itself, it is not within the constitutional requirement as to amendments, though it may, by implication, modify or repeal prior acts, or part thereof. The constitution does not make the obviously impracticable requirement that every act shall recite all other acts that its operation may incidentally affect, either by way of repeal, modification, extension, or supply. The harmony or repugnance of acts not passed with reference to the same subject can only be effectually developed by the clash of conflicting interests in litigation, and the settlement of such questions belongs to the judicial, not the legislative, department."

The next point made by the State will be sufficiently disclosed by the following observations:

If the said act of 1905 applies only to interurban lines and street railway companies whose lines extend beyond a single city, it is constitutional. If it applies to street railway lines confined to a single city and not extending beyond the boundaries thereof, it is unconstitutional, either in whole or in part, in accordance with its capability or incapability of subjection to a division of the subjects contained in it. It is perfectly clear that the method of taxation provided in the act is just and reasonable when applied to interurban lines.

The reasons supporting this method of assessment, as applying to railway lines, running through more than one county, are fully stated in *Franklin County* v. *Railroad*, 12 Lea, 521, 534, 542, and need not be repeated here. The same reasons, we think, would apply to the property of a street railway company whose lines extend beyond the limits of a single city, even though they do not run to any other city. The reason is that the city should not tax so much of the line as runs beyond its limits, but only the values lying within it. In order to reach a true result in such a case, it is necessary that the division into distributable and localized property be made, as provided in section 7 of the foregoing act of 1897.

If we construe the act as applying to the lines of a street railway company confined to a single city, and not extending beyond the boundaries of such city, it would be unconstitutional, at least in part, since no good reason could be assigned for such a classification, or why street railway companies of this description should be subjected to a mode of taxation different from that applied to electric light companies and water companies, provisions concerning the assessment of which appear in sections 22, 24, c. 258, pp. 646, 651, Acts 1903.

It is our duty to construe the act in such way as to hold it constitutional, if we can do so in accordance with sound reason. We are of the opinion that the present act can be so construed, and that it applies only to in-

terurban lines and street railway lines extending beyond
the boundaries of a single city.   This is apparent from
sections 3 and 7.

It is insisted that what is said in section 3 concerning
electric light and power- properties introduces a new
subject, and makes the act void, as in violation of arti-
cle 2, section 17, of the constitution, which provides that
no bill shall become a law which embraces more than
one subject, that subject to be expressed in the title.   It
is also said that this provision is in violation of article
11, section 8, of the constitution, because it makes an
unreasonable classification in favor of electric light
plants owned by street railway companies, as against
independent electric light plants.   The reason given for
this objection is that independent plants must be taxed
as set out in sections 22, 24, c. 258, pp. 646, 651, Acts
1903, while under the present act an electric light plant
owned by a street railway company whose lines extend
beyond the city obtains the deduction in value which
must necessarily arise from the division of the sum of
valuation within the city by the whole mileage of the
street railway company extending beyond the city, while
no such deduction is possible under the provisions made
for other electric light companies.   We think the ob-
jection is valid, and that so much of this act as makes
provisions for the assessment of electric light plants
owned by street railway companies is unconstitutional.
However, this does not make the whole act void, since
this subject is easily separable from the body of the act,

leaving the residue unimpaired. *State, ex rel.*, v. *Trew-hitt*, 113 Tenn., 561, 82 S. W., 480.

The same is true of so much of the last section as refers to the back assessment of railroads, telephones, and telegraph companies (in the last clause of section 18) objected to by counsel for the complainant. These subjects are wholly foreign to the title of the act, but may be elided without impairing the integrity thereof. We can have no doubt that the legislature would have passed the act with both of the objectionable features referred to left out. *State, ex rel.*, v. *Trewhitt*, supra; *State* v. *Wilson*, 12 Lea, 246, 254.

A criticism is made upon the act to the effect that section 18 speaks only of street railroads. However, it is clear that construing the whole act together it was intended by the legislature in this section to cover, not only street railroads, but interurban railroads as well.

There are other criticisms of the act made by counsel which we have carefully considered and found not well made, but do not deem them of sufficient importance to merit a more particular reference here.

It does not appear from the allegations of the bill whether the lines of the Memphis Street Railway Company extend beyond the limits of the city of Memphis or not; and so it does not appear from the bill whether the lines of the company referred to fall within the act which we have above held constitutional or not. We

cannot presume that the officers of the State acted illegally.

It follows that the contention of the State, with respect to the year 1905, must be disallowed.

However, as to the years 1902, 1903, and 1904, the complainant is entitled to relief for the reasons already given.

The next and last question is whether the court shall permit a return to the alternative writ, or whether a peremptory writ shall be ordered to issue at once.

In Merrill on Mandamus, after stating the older and harsher practice, the author continues:

"The custom now is, if the demurrer to or the motion to quash the alternative writ is overruled, to allow the respondent to put in a return. This is not conceded to be a matter of right, but is considered proper when justice requires that the respondent should be allowed to answer. Sometimes the court has required the respondent to submit to it his proposed answer, or to show the merits of his defense by an affidavit, or has received the oral statements of his counsel in lieu of an affidavit. In such cases, if the court considered the proposed defenses to be without merit, or that they had already been passed on in the decision of the demurrer, or motion to quash, the respondent was not allowed to make a return and a peremptory writ was ordered."

No suggestion has been made that the bill stated incorrectly the facts in respect of the county trustee's refusal to take jurisdiction of the controversy. The

cause will be remanded to the chancellor, with directions to issue at once a peremptory writ, directing the county trustee to take jurisdiction of the controversy, and proceed to hear it in respect of the taxes of 1902, 1903, and 1904.

The costs of this cause will be paid by the defendant.

## ON REHEARING.

This case was before us on a former day of the term, and is now before us again on petition to rehear, and to modify our former opinion, in so far as it refers to section 3, c. 513, p. 1153, Acts 1905, in relation to the electric-lighting business of street railway companies. It is said that the Memphis Street Railway Company, whose property is under consideration in the present case, is engaged in no such lighting business, hence that the question does not arise here and should not be disposed of in the opinion; and that what was said in the former opinion will unnecessarily and unjustly affect the business of other companies that are not before the court, and that have no opportunity to be heard. Furthermore, it is said that the business of electric lighting, in respect of those street railway companies that are so engaged, is so intermingled with their street railway operations that they cannot be separated for the purposes of assessment, so as to reach any just result, either to the State or to the companies so engaged.

It is, of course, a matter to be regretted that the decision of a case as a result of the enunciation of the

principles upon which it is based, always affects, indirectly at least, the rights of people not before the court; but this is a necessary infirmity, or incident at least, of all judicial proceedings which the wisdom of man has never been able to cure or change. We do not agree with counsel that it is unnecessary in the present case to consider the provisions of section 3, c. 513, p. 1153, Acts 1905, so far as they relate to electric lighting. It is necessary to pass upon that part of it which refers to electric lighting, because the attorneys for the complainant have challenged that particular feature of the act as introducing a new subject, and making the whole act void as in violation of article 2, section 17, of the constitution, and also as in violation of article 11, section 8, of that instrument. In the former opinion the conclusion was reached that the provision referred to constituted a separate subject, but might be elided, as merely incidental, under the rule as laid down in *State, ex rel.*, v. *Trewhitt*, 113 Tenn., 561, 82 S. W., 480, and *State* v. *Wilson*, 12 Lea, 246, 254, and other cases, leaving the residue of the act to stand. I am still of that opinion, but the majority of the court have reached a different conclusion on the following grounds, in which I concede that there is great force.

The statute under which street railway companies, and interurban companies are authorized to engage in the business of electric lighting, is chapter 406, p. 1150, Acts 1903. The first section of that act reads as follows:

"Section 1. Be it enacted by the general assembly of

the State of Tennessee, that sections 6 and 13 of the act entitled 'An act to provide for the organization of corporations,' approved, March 23, 1875, being chapter 142 of the acts of 1875, be so amended that railroads and railway companies constructing, owning, and operating with electricity interurban railroads and street railroad companies, shall have and be invested with the following additional rights and powers to wit:   To manufacture, generate and distribute electric light, electric heat and electric power for the purpose of supplying themselves and others; to construct, equip and own factories, plants, machinery and all appliances for the manufacture, generation and distribution of electric light, power and heat; to acquire, by purchase, lease, or other lawful contract, electric plants, factories, machinery and all appliances for the manufacture, generation and distribution of electric light, power and heat; to acquire by purchase, lease or other lawful contract, electric plants, factories, machinery, equipments, and appliances, and rights, easements, licenses and franchises, necessary or convenient to manufacture, generate, distribute and sell electric light, power and heat; to supply and sell to others electric light, power and heat; to acquire by purchase, lease or other lawful contract, water power, riparian and water rights together with all such licenses and franchises, easements, and privileges attached to, necessary or convenient to operate and use the same; and to have and possess all such other powers as shall be necessary

to execute and perform the powers hereinbefore grant-
ed."

Section 3, c. 513, p. 1153, Acts 1905, reads as fol-
lows:

"Sec. 3.   Be it further enacted that every person, or
corporation, owning, leasing, or operating interurban
and street railroad properties, including electric light
and power properties when owned or operated in con-
junction with street railroad properties shall file with
the comptroller of the State biennially on or before the
first day of April, commencing with 1905, a schedule or
schedules stating and giving the following facts and
information, viz:   A list or statement of all of his or
its property, real, personal, and mixed, owned or leased,
setting forth therein the length in miles of the entire
roadbed, switches, and side tracks showing the number
of miles in each county, and the number of miles in each
city, or incorporated town, the value of the whole, the
amount of capital stock controlled by the corporation,
the bonded debt, the gross annual receipts of the preced-
ing fiscal year, the number of cars, their classes and
value, the location, description, and value of all car
sheds, transfer stations, power houses, and other real es-
tate, and all real, personal, and mixed property belong-
ing to the person or company owning said railroad, if a
part of, and used in connection therewith, together with
its value."

Upon further consideration of the matter, and con-
struing the foregoing section in connection with section

State, ex rel., v. Taylor.

1 of the above-mentioned chapter 406 of the Acts of 1903, the majority of the court are of opinion that the language upon the subject of electric lighting appearing in the foregoing section of the Acts of 1905, viz., "including electric light and power properties when owned or operated in conjunction with street railroad properties," applies only to the case of electric lighting operations arising solely from the running of an electric railway plant as a railway, and to the sale of its surplus electricity so generated, and does not cover the case of a street railway company, or interurban company, owning and operating a separate electric light plant, or a plant run under chapter 406 of the Acts of 1903 for the purpose of conducting the business of electric lighting; and, in this view, that the provisions of section 3, c. 513, p. 1153, Acts 1905, upon the subject of electric lighting, do not constitute a separate subject in violation of article 2, section 17, of the constitution, and that so construed, the aforesaid section 3 of Acts of 1905 is not in violation of article 11, section 8, of the constitution. What would be the result in the case of a distinct plant owned or leased and operated by an electric railway company, and not an integral part of its railway business, the court thinks does not arise in the present case, and need not be considered.

## ON MOTION TO MODIFY ORDER.

After the original opinion was handed down in this case on the 20th of June, an application was made by de-

fendant's counsel for a modification of the order directed
in the last paragraph upon the subject of the issuance
of a peremptory *mandamus,* so as to permit the filing of
an answer upon the remand to the chancery court.   This
was opposed by counsel for complainant, and the court
finally settled the particular controversy thus arising
by entering  an order granting to the defendant ten days
from the adjournment of the court within which to file
an affidavit setting forth the defense which he desired
to incorporate in the answer which he proposed to file.
This course, sanctioned by the authority cited in the
original opinion, was adopted with the view, on the one
hand, of avoiding the possibility of shutting off a just
defense, and, on the other, of guarding against unneces-
sary delay in the hearing of the controversy which the
court had held it was the duty of the county trustee to
take jurisdiction of and to hear.

Within the ten days granted the defendant filed his
affidavit, stating his grounds as follows:

"That at the time the matter of the assessment of said
street railway was taken up before him, as a *quasi* judi-
cial officer, affiant was informed and ascertained as a
fact during his investigation into the facts of said back
assessment for the years 1902, 1903, and 1904 that the
Memphis Street Railway Company had been regularly
assessed by the assessor of Shelby county, that said as-
sessment had been reviewed by the county board of as-
sessors for Shelby county, and that an appeal had been

taken from the said county board to the State board of equalization, and that said appeal had been acted upon, and that an assessment had been finally made on said street railway company by said State board under said appeal. This affiant, then acting as a *quasi* judge and construing the law and the acts of the legislature as best he could, deemed himself bound by the assessment of said State board for said years. He thereupon ruled that the assessment made by the State board was a finality, and that he acting in said *quasi* judicial manner was bound thereby, and that he was without jurisdiction to proceed further in the matter of said assessment.

"Under citation served on the Memphis Street Railway Company, the following facts among others were disclosed during the examination for the respective years:

"1902. For the year 1902 the Memphis Street Railway Company appealed from the assessment of the assessor to the county board of equalization, and the county board of equalizers assessed the corporate property of the Memphis Street Railway Company at and for the sum of $980,000. From this assessment the State of Tennessee and the county of Shelby appealed to the State board of equalization, and this board assessed said property at and for the sum of $1,700,000. Affiant further found as a fact that the State board of equalization did during September, 1902, certify this fact to the county clerk of Shelby county, Tennessee.

"1903-04. The county assessor, in the years 1903-04, following the action of the State board of equalization for the year 1902, assessed the property of the Memphis Street Railway Company for each of these years at and for the sum of $1,700,000. The county board of equalizers reviewed the assessment for the year 1903, and also for the year 1904, and approved these assessments for both years. The State board of equalizers for both of these years approved the finding of the county board of equalization, and placed the assessment for each year at the sum of $1,700,000.

"Affiant further found that the assessment acts of 1901 and 1903, in section 33 of each act, provided as follows: 'When the county board of equalizers shall have determined the matters of equalization and value before it, and within its jurisdiction, such action shall be final except in so far as the same may be reviewed or changed by the State board of equalization.' Also under Acts 1901, p. 346, section 38, subsec. 10, this language is used: "The action of the State board of equalizers shall be final and conclusive as to all matters passed upon by the board, and taxes shall be collected upon the values so fixed and found by said board.' The same identical language is used in Acts 1903, p. 674, c. 258, section 38, subsec. 10. This condition of facts, together with the law which your affiant presumed to be applicable to his action in the premises, constrained affiant to hold that the assessment of the State board of equalization was final, and that affiant was without jurisdiction, and

had no authority to make the assessment against said properties as requested."

There are other averments in the affidavit, covering the year 1905; but, as the controversy in respect of that year has been eliminated, we need not further refer to this portion of the affidavit.

The defense sought to be interposed as to the assessment for the years 1902, 1903, and 1904 is, in short, that, inasmuch as the State board of equalization had acted upon the assessments for each of these years, and subsection 10, above quoted, declares that the action of that board shall be "final and conclusive," there can be no back assessment, or reassessment, under section 31 quoted in the original opinion.

We shall now examine this position.

In order to properly determine the matter, we shall have to construe sections 31 and 38 of the said chapter 258 of the Acts of 1903; and, in doing so, we shall at the same time construe the act of 1901 referred to, since they are in respect of this matter the same.

In the original opinion section 31 is set out in full. By reference to that section, it will be seen that beyond doubt five cases are stated (subsections 1 to 5, inclusive) in which back assessments may be made.    It is unnecessary to consider whether an additional ground is given in subsection 6.    It is perceived that in three of the five instances (subsections 2, 3, 4) a case is supposed in which the board of equalization has already acted.    So that, if subsection 10 of section 38, quoted in the affi-

davit, has a universal application—that is, admits of
no exception to the generality of its language—sec-
tions 31 and 38 are directly in conflict.    But the dictate
of common sense, as well as the letter of the law, is that
the several parts of an act must be considered together,
and so construed as to accomplish harmony between
them, if that can be done.

In the original opinion we quoted subsection 11 of
section 38.   Turning to the language there quoted, it
will be observed that the duty is devolved upon the
State board of equalization to hear appeals upon mat-
ters of back or reassessment made by revenue agents or
other officers of the State from county trustees or coun-
ty court clerks; that the right of appeal from the de-
cision of the county trustees, or county court clerk, as
the case may be, in back assessment cases heard by
them, or either of them, is given to the State, the county,
and also to the taxpayer or citizen whose property has
been reassessed, and that it is made the duty of the State
board to hear the matter in controversy.   This subsec-
tion 11 immediately follows subsection 10 quoted in de-
fendant's affidavit.   Reading these two subsections of
section 38 together, there can be no sort of doubt that,
whatever may be the scope of subsection 10 in respect
of the finality or conclusiveness of the action of the
State board, it cannot extend so far as to exclude cases
of back assessment or reassessment authorized by other
parts of the act, but as to such matters they are to be
treated as exceptions to the rule of finality expressed in

State, ex rel., v. Taylor.

subsection 10. Indeed, so careful was the general assembly to make sure the right and power of back assessment or reassessment in the special cases provided for, that it was declared in subsection 5 of section 38 that the State board during its biennial session, "or at any other time," "shall have the power to send any of its members to any portion of the State to obtain information and evidence deemed material, and to hear questions upon appeal from the action of trustees and county court clerks." The subsection continues: "In cases of back assessments and re-assessments, to the duties of equalization, said board, whenever deemed material, may hold at any time, sessions at said capitol or elsewhere for the transaction of business, other than that to be performed during the biennial sessions, which sessions may be held either before or after said biennial sessions," etc. The lawmaking body returns to the subject again in section 39, wherein it is declared that the assessments provided for in section 31 (that is, back assessments) shall not be made for any year other than "for the year in which said assessments shall be made, and for three years preceding same." So, if there is anything in the act wholly outside the field of doubt and speculation, it is that it was the purpose of the legislature to provide for back assessments in proper cases; but there never could be a back assessment if the action of the State board were final, in the sense suggested in defendant's affidavit, on the ground that it had passed upon and settled the original assessment, either under

its general operation as a board of equalization or. on the exception of some taxpayer to the action of the county board; since the State board in one or the other of these methods passes upon all original assessments. The act provides (section 33) that all assessments shall go before the county board of equalizers. From this board they are passed on to the State board. Chapter 258, at pages 666, 667, 670, Acts 1903. The functions of the county board are triplicate—the primary one to equalize the assessments over the whole county; a secondary, or at least an additional, one, to hear complaints of individual taxpayers, either that the property of other taxpayers or of some other taxpayer is assessed lower than his own, or that his property is assessed too high, or the board may of its own motion raise or lower any assessment so as to place the property at its actual cash value. Acts 1903, pp. 665, 666. But the county board cannot raise any particular assessment until the property owner or owners affected by the increase shall have been notified and given an opportunity to be heard. Id., p. 665. When the county board of equalizers shall have determined "the matters of equalization and values, before them, and within their jurisdiction," such action, the statute provides, "shall be final, except in so far as the same may be revised or changed by the State board of equalization." Id., p. 667. The functions of the State board are in the main substantially the same as those of the county board, modified by the fact that the scope of its operations is wider, and that it does not en-

tertain original complaints of individual taxpayers ex-
cept in the one instance below mentioned.   The primary
duty of the State board is to equalize the assessments in
the several counties over the whole State, so as to make
them conform to the standard of the actual cash value
of the properties involved; in performing which duty
equalization may be made by classification of properties
by wards, civil districts or counties, or in such manner
as may be deemed best to enable the board to justly and
equitably equalize assessments in conformity with the·
standard of actual cash value.   Id., p. 673.   This is the
main work of the biennial session.   Pages 672, 673.   But
at this session the board may hear the original complaint
of an individual taxpayer that other property than his
own has been assessed at less than its actual cash value;
and, as incidental to its power to re-examine, or review
the work of the county board, it may re-examine com-
plaints of this character made in that board, as well as
the action of that board upon the complaints of indi-
vidual taxpayers as to the valuation of their property.
This power is found in the general duty of equalization
(section 38, *passim*), and also in that portion of section
33 which provides that the matters of equalization and
values before the county board, and within its jurisdic-
tion shall be final, "except in so far as the same may be
revised or changed by the State board of equalization."
Page 667.   Another important function of the State
board is to hear appeals from the decisions of county
trustees and county court clerks in the matter of back

assessments.    Section 38, subsec. 11; also, subsection 5, pp. 673, 676.    Now, going back and stating in outline the process of assessment from the beginning to its completion, we have, first, the assessments made by the county and district assessors.    Sections 13 to 18; sections 21 to 26.    Then follow in regular order the duty of the assessors to turn over their assessment lists and books to the county court clerk (section 19), the requirement that the county court clerk shall turn over to the county board of equalization the assessment lists or rolls at its first day's session for its consideration (section 33, p. 665), the provision that the county board of equalization shall upon the completion of its labors deposit its records and papers, together with the assessment lists with the clerk of the county court for preservation (Id.), and shall furnish a summary of its work together with a tabulated statement of certain data, to the State board of equalization (pages 666, 668, 670), then the performance by the latter of its duties in the valuation and equalization of property, as above mentioned (section 38, *passim*), and finally the certification by that board to the several county court clerks, showing corrections and changes in assessments, and the increases and decreases in the value of property, and the duty of the county court clerks to make proper and correct entries of these matters upon the tax books, to be turned over to the county trustee (page 674).    Thus, it is perceived, all of the assessments come before the State board in regular course.    Such changes as they

make in individual assessments they make in the course
of the regular routine.   No appeal is provided from
the county board to the State board.   None is needed.
Objections made in the county board can be followed into
the State board, and there renewed under forms and
methods the latter may prescribe pursuant to subsec-
tion 4 of section 38.   From all this, it is clear there is
no trial in the sense of a litigation between contending
suitors, but merely the means and methods provided for
an administrative branch of the public service to enable
it to reach a correct result in the assessment of prop-
erty.   No notice to the taxpayer is required, but he must
take notice from the statute itself of the biennial ses-
sion.   Page 672.   But, when the machinery is put in
motion to back assess the property of a citizen, a mark-
ed change is noted.   He must be served with a personal
citation to appear before the county trustee (or county
court clerk, as the case may be) and show cause, if any
he has, "why said property should not be back assessed
or reassessed at its actual cash value."   Page 662.   Un-
der this citation a regular trial is had before the county
trustee (or before the county court clerk, in the case of
merchants' taxes), as a result of which he is to render
a decision, fixing the rights of the parties, from which
an appeal may be prayed and prosecuted by either party
to the State board of equalization (subsection 11 of

section 38, p. 674), "whose duty it shall be to hear the matter in controversy." Ib. Now, it is clear that subsection 10 of section 38, viz., "The action of the State board of equalizers shall be final and conclusive as to all matters passed upon by the board, and taxes shall be collected upon the valuations so fixed and found by said board," has quite a different meaning from that suggested in the affidavit. It means, indeed, that these valuations are not to be interfered with or changed by any other tribunal or court. It does not mean that the power of the State board is limited thereby; that is, it does not mean that when the State board shall have acted upon the valuations in the course of its ordinary routine in reviewing the work of the county board, that it (the State board) shall thereby cut itself off from a re-examination of particular assessments under proceedings instituted for procuring back assessments. To so hold would be to nullify every provision in the act upon the subject of back assessments. It is indeed true that the legislature intended to declare in subsection 10, supra, that whenever the State board had finally passed upon the assessments, under all of the powers conferred upon it, whether through its routine work of equalization at its biennial session, or subsequent proceedings for back assessment, this should be an end of the matter.

The learned counsel for defendant do not go so far in their brief as the defendant goes in his affidavit. In the brief it is said:

"Now, we earnestly submit that subsection 10 is a general provision, and as aforesaid applies absolutely and unequivocally to all matters that have been passed upon by the State board of equalization.  However, section 31 is a special provision applying only to the enumerated class of cases mentioned therein, and therefore in our opinion a proper construction of these two sections taken together is that all matters concerning the valuation of properties when passed upon by the State board of equalization are final, except in those cases which are mentioned in section 31, and which are exceptions to the general rule of finality."

This construction is assented to in the reply brief of complainant's counsel.

It is perceived that it is the same in substance as that reached by the court upon an extended review and comparison of all of the provisions of the statute applicable.

So, the court and the counsel upon both sides are at one on the proposition that proceedings for back assessments falling within the provisions of section 31 are in nowise precluded by the provisions of subsection 10 of section 38, but may be instituted and carried to a conclusion under section 31 and subsection 11 of section 38.

This would seem to end the controversy by a general accord.  Counsel for defendant, however, insist that the case before us does not fall within the several grounds for back assessment, or any of them, set forth

in section 31. But counsel are precluded from making this point by the language of the original opinion in this cause. In that opinion we said:

"Before directly taking up for consideration the points in the demurrer, we deem it proper to say that we think the facts stated in the bill, which we have set out, make out a case for the jurisdiction of the county trustee to reassess or back assess the property of the Memphis Street Railway Company, within subdivisions 2, 3, and 5 of section 31, above set out, of chapter 258 of the Acts of 1903."

That determination cannot be reopened after the close of the term, nor could it be at any time made in the form of the present application. Besides, we are content with it as it stands, believing it to be perfectly sound and just.

In view of the construction given to the act, and our holding that the controversy as set forth in the bill falls within the provisions of section 31, no other conclusion is possible than that a proper case was stated for the jurisdiction of the county trustee; that the affidavit fails to show any reason why he should not take jurisdiction and proceed with the hearing of the case; in short, that it appears the defendant has no valid defense to offer against the issuance of the peremptory writ of *mandamus*, and the same order must be made upon this subject which was directed to be made near the close of the original opinion.

There is nothing in the numerous authorities cited

in defendant's brief that gainsays the conclusion we have reached. The whole matter turns upon the construction of our statute.

The question is argued in the brief of defendant's counsel whether subsection 6 of section 31 of the act merely provides the means by which relief is to be had under the several grounds set out in subsection 1 to 5, inclusive, or whether, in addition, it contains a sixth ground, viz., the mere fact that the property was not originally assessed at its actual cash value. The defendant's counsel insist that the former is the correct view, and that the latter is wholly inadmissible. The complainant's counsel insist that the case presented by the bill is one of an undervaluation so gross as to place the subject-matter in the category of omitted property. We deem a consideration of these questions out of place here, since, as already stated, it was held in the original opinion that the bill made out a case under subsections 2, 3, and 5, of section 31 of chapter 258 of the Acts of 1903, and the affidavit filed by defendant under permission given at the last term shows no reason why he should not take jurisdiction and proceed to the discharge of his duty in the hearing and determination of the cause brought before him.

Let the order as above indicated be made for a remand to the chancellor with the direction to issue a peremptory *mandamus*.

The defendant will pay the costs of this proceeding.